
FILED

AUG 0 3 2015

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ________ DEPUTY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CARMEN KROWELL, Plaintiff, | § | SA15CA0638 RP |
| vs. | § | CAUSE NO. ________ |
| | § | |
| THE UNIVERSITYOF THE INCARNATE WORD, Defendant. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

CARMEN KROWELL, Plaintiff herein, files this her Original Complaint, complaining of THE UNIVERSITY OF THE INCARNATE WORD, Defendant herein, and in support thereof would show the Court as follows:

**I.**
**JURISDICTION AND VENUE**

1. This action is brought pursuant to Title VII of the Civil Rights Act, as amended 1964, 42 U.S.C. '2000e, et seq. claiming discrimination the basis of age, religion, national origin, race, and sex; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., claiming discrimination on the basis of color, race (Colombian), and national origin (Colombian-American); and the Age Discrimination Act of 1975, 42 U.S.C. § 6101-6107.

2. Jurisdiction in this Court is proper under 28 U.S.C. § 1331.

3. Venue in this Court is proper under 28 U.S.C. § 1391 (b), (c) and (d) because the Defendant is a private educational institution (non-profit) subject to personal jurisdiction in this judicial district and because this judicial district is where a substantial part of the events or omissions giving rise to the asserted claims occurred.

## II.
## PARTIES

4. Plaintiff resides within Bexar County, is employed by the United States Air Force and applied for acceptance in the Masters in Hospital Administration Program offered by Defendant

5. Defendant, THE UNIVERSITY OF THE INCARNATE WORD is a non-profit private educational institute with its University located in San Antonio, Bexar County, Texas and which receives federal assistant funding. Defendant may be served with service of process by serving its Register Agent for Service, Cynthia S. Escamilla, 401 Broadway, San Antonio, Texas 78209

## III.
## CONDITIONS PRECEDENT TO SUIT

**A. Plaintiff is in Protected Class:**

6. Plaintiff is a fifty (52) year old Colombian-American of Colombia origin.

7. Plaintiff is a female.

8. Plaintiff is a Veteran with thirty-two (32) years of service in the United States Air Force and stationed at Lackland Air Force Base, (AFB) San Antonio, Texas.

9. Plaintiff served in Afghanistan in a medical unit assigned to treat wounded American soldiers, NATO soldiers and civilian nationals for battle injuries.

10. Plaintiff has/had Veteran preference.

11. Plaintiff after completing her tour and returned to the United States of America, she was suffering from extensive hearing loss to her right ear requiring an operation and post-traumatic stress. Plaintiff suffered from disabilities at the time she applied for Defendant's Master's in Hospital Administration Program.

**B. Defendant's Posting of its Masters in Hospital Administration Program:**

12. On or about April 24, 2014, Plaintiff found Defendant's web-site in which it offered a Masters' degree in Hospital Administration.

13. Defendant's website referred to its college programs as being "geared towards the working adult; offering classes in the evenings and on the weekends".

14. Defendant offered the following programs: MAA Health Care Administration and the MHA, Master in Health Administration Program and described its Master's Health Administration program as: "courses focus was on and integrate managerial responsibilities, functions, roles related to human resources management, budgeting and financial decision making."

15. Defendant's MHA requirements are not addressed separately and appear to fall under the same requirements of Defendant's MAA. Defendant identifies the general educational requirements for its Masters' programs as (identified on Defendant's website):

A. Must have earned a Baccalaureate degree from accredited institution with an overall GPA of 2.5 or higher. Students with a GPA between 2.0- 2.5 can be admitted conditionally with an acceptable admission exam score.

B. Submit official transcripts from each college/university attended.

C. At least one of the following as specified by the degree program.

D. National recognized entrance test specified by the discipline.

E. Evaluation by one or more professionals from the intended field of study

F. Professional Certification or a degree of equal or higher level than that sought from an accredited institution of higher learning

G. Letters of Recommendation.

16. Defendant described (Defendant's website) its educational requirement of admission to its MAA Program (Tier 1) being granted to applicants who satisfy all general requirements for admission to graduate studies to include:

a. Baccalaureate degree with a minimum GPA of 3.0;

b. Official transcripts of all undergraduate and graduate work; and

c. A completed application.

GRE not required for Tier 1 and 11 applicants.

17. Explanation of Tier Students:

a. Tier 1 minimum GPA of 3.0;

b. Tier 11 Alternate admission to MAA program GPA 2.50 but less than 3.0; and

c. Tier 111 GPA of 2.00 but less than 2.5; must take GRE or GMAT.

18. Defendant's additional requirements were explained as "Other admission criteria as specified by the discipline may include but are not limited to:

a. A minimum number of credit hours in the discipline with a specified GPA with a specified GPA minimum.

b. Other specialized test with acceptable performance.

c. An interview with faculty or admissions personnel.

d. A writing sample."

19. Defendant's subsections A through D were identified in claim No. 18 above were not listed as admission criteria for the MAA program.

20. Plaintiff met all educational criteria with stellar qualifications including work experience in the subject matter of Defendant's Masters in Health Administration in

which Plaintiff applied for acceptance into Defendant's Masters Health Administration Program.

**C. <u>Defendant's Selection Process is Discriminatory was Discriminatory based on Color, Race (Columbian-American), and National Origin (Columbian), Sex (Female), and Age</u>**

21. Defendant's website did not specify how many slots would be allocated for the Fall semester of 2014.

22. On or about April 24, 2014, Plaintiff contacted Mr. Johnny S. Garcia Jr., Defendant's MS Assistant Director of Graduate Admissions for the purpose of clarifying the difference between the two Health Care Programs, MAA Health Care Administration and the MHA, Master in Health Administration Program, which Defendant offered.

23. Defendant's MHA was geared towards mid to upper management level in a hospital and the MAA was geared to an entry level position.

24. Plaintiff submitted her admissions package to Mr. Johnny Garcia on or about May 1, 2014, and followed up on her application with Mr. Garcia via email on May 7, 2014.

25. Plaintiff met with Mr. Garcia who recommended to Plaintiff pursue the MHA based on the information she provided Garcia associated to her work experience and educational background.

26. On or about May 8, 2014, Plaintiff was contacted by Dr. Daniel G. Dominguez, Director, and Graduate Program in Health Administration informing Plaintiff of the next steps required for MHA program.

27. Dr. Dominquez requested from Plaintiff a two (2) page Statement of Purpose (SOP) describing why Plaintiff wanted to pursue an MHA Degree and why she had

chosen to attend UIW.

28. Plaintiff followed up with a telephone call on or about May 8, 2014 and spoke with Dr. Dominquez. Dr. Dominquez requested from Plaintiff copies of transcripts from all universities she had acquired degrees and names of all schools Plaintiff attended.

29. On or about May 14, 2014, Plaintiff followed up via email to Mr. Garcia inquiring about the status of the transcripts, as well as, sending him and Dr. Dominguez the Statement of Purpose.

30. On May 22, 2014, Dr. Dominguez informed Plaintiff that he had received her Statement of Purpose and would contact Plaintiff to schedule an on campus interview. Plaintiff asked Dr. Dominquez about the administrative fees and informed Dr. Dominquez she had received the rest of her transcripts.

31. On or about May 29, 2014, Dr. Dominguez, via email informed Plaintiff of the on Campus interview with him and Dr. LaFrance, scheduled for June 3, 2014.

32. On June 3, 2014, Plaintiff arrived at Mr. Garcia's office to drop off her transcripts and pay her fee; and wait for her interview.

33. Present in the interview were, Dr. LaFrance and Dr. Dominquez who was the main interviewer. Dr. Dominquez initiated the meeting by asking Plaintiff to explain a little about herself.

34. Plaintiff informed Dr. LaFrance and Dr. Dominquez that she had worked many years in the corporate sector; she was in the Air Force; had just gotten back from Afghanistan working with a medical unit in Kandahar; why she was interested in the MHA degree; this was going to be her last deployment; that currently she was volunteering at the VA hospital; and eventually wanted to work in a civilian or VA

hospital. Further, that she was currently volunteering at the VA Hospital.

35. Dr. Dominquez explained that the type of work Plaintiff was performing with the VA hospital was not what "they were looking for".

36. Dr. Dominquez stated that the VA was not one of the Defendant's partners; and disclosed that the Defendant had a partnership with UTC; UIW Crista Santa Rosa, and UTC Science Centers and that the Defendant sent its students who were in the MHA program to work with the management team at these hospitals.

37. During the interview, Plaintiff was informed for the first time by Mr. Dominguez that an internship was required for the MHA program. The internship was not mentioned in Defendant's website as a requirement for their MHA program.

38. Dr. Dominquez explained that the Defendant's MHA program internship required an eight (8) hour per week with a future increase of twenty (20) hours per week. Defendant did not disclose whether the internship was a paid internship. Plaintiff was informed she would be required "to shadow" upper management/administrators who worked in the MHA field, including the CEO.

39. Plaintiff pleaded with Dr. Dominquez and Dr. LaFrance that she could work evenings and weekends to accomplish the requirements of the internship. Dr. Dominquez then disclosed that the internship re be performed Monday through Friday from 8:00 am to 5:00pm; and that Plaintiff would be required to work with the hospital administration during these hours she would have to work.

40. Plaintiff disclosed her concerns to Dr. Dominquez and Dr. LaFrance regarding the Defendant's misleading advertisement on its website in stating that Defendant's programs were "geared toward the working adult providing classes in the evenings and

weekends". Plaintiff informed Dr. Dominquez and Dr. LaFrance that the hours and days of work requirements of the internship would not be conducive to daytime Monday through Friday working professionals.

41. Dr. Dominguez stated that "they" (Plaintiff believes Dominquez was referring to Defendant's hospital coalition/partners) were going to hold meetings addressing these concerns. Dr. Dominquez asked Plaintiff if she would be interested in attending such meetings to which Plaintiff replied, she was interested and hence, that she "would love to as [she] could bring these concerns of the working adult to UIW [Defendant] and their partners".

42. Plaintiff informed Dr. Dominquez and Dr. LaFrance that she was in the military and could not be gone for twenty (20) hours a week; and that she could lose her job and medical benefits.

**D. <u>Discrimination Based on Gender, Age, National Origin, Race, Gender, Disability (PTSD), and Color</u>**

43. Dr. Dominguez told Plaintiff, "Ms. Krowel it has been awhile since you have been in school and things have changed."

44. The majority of the interview focused on Defendant's internship program and why Defendant felt it needed to increase the hours of the internship.

45. Plaintiff made it clear to Dr. Dominguez and Dr. LaFrance that she would complete the internship although she would have a hard time with the twenty (20) hours a week.

46. Plaintiff mentioned during the interview that: she spoke fluent Spanish and had been a Linguist with the United States Air Force in Honduras; had been assigned to medical unit in Afghanistan; graduated from a Catholic University; how important a

Catholic education was to her; had experience in the business sector; and had worked for Job Corps with no follow up questions by Dr. Dominquez nor Dr. Dr. LaFrance.

47. Defendant was "going through the motions" of an interview process and had no interest in Plaintiff's work, education or military background. Defendant's interview was not more than twenty minutes.

48. Defendant's entire interview lasted approximately fifteen to twenty minutes. Dr. Dominguez interrupted Dr. LaFrance and stopped the interview saying he had other interviews to conduct and that he had already run over the allotted time for Plaintiff's interview. Dr. LaFrance informed Plaintiff that it would not preclude Plaintiff from acceptance if she was not able to do the internship.

49. On or about July 29, 2014, Plaintiff via email asked Mr. Johnny S. Garcia Jr., Defendant's MS Assistant Director of Graduate Admissions, if a decision had been made on the selection of admission. Mr. Garcia informed Plaintiff a decision had been made and to provide a telephone number where she could be reached. Mr. Garcia returned Plaintiff's telephone call and informed her she had not been selected for Defendant's MHA program.

50. Plaintiff asked Mr. Garcia what the reasons were for her non-selection and was directed to contact Dr. Dominguez.

51. On or about July 29, 2014, Plaintiff via email to Dr. Dominguez requesting information related to her non-selection. Mr. Dominquez did not respond to Plaintiff's several and repeated requests via email and telephone communications.

52. On August 27, 2014, Plaintiff e-mailed Dr. Dominguez presenting the following:

a. Requesting reasons for her non-selection to Defendant's MHA program.

b. That she was a Veteran and believed that with her past academic/degrees/work experience, made her more than qualified to be accepted into Defendant's program.

c. That her GI Bill benefits as well as her student loan were in place; [and] "believe your decision denied me an education that I feel I [she] have a right to if I had the education and the means to pay for it."

d. That if the problem was the internship, Plaintiff believed she made it very clear "to you and Dr. La France" that she would do everything in her power to complete the internship.

e. That Dr. Lafrance stated that the decision of acceptance would not be based on the internship.

f. That if this program is set up for adult students, then Plaintiff believed it is geared to keeping out the working adults that cannot take twenty hours a week to work and participate in an internship in a hospital.

g. That "you knew I was already volunteering at the VA Hospital and I am sure that this would also have been a benefit to my degree. At the interview you and Dr. Lafrance asked me if I would be interested in being part of a committee to look at the impact this internship had on the working adult. I told you and Dr. LaFrance that I would be very interested."

h. "Please keep in mind that I am not applying to Law School or Medical School. I don't believe UIW's MHA program has the stringent

requirements/prerequisites those degrees require".

i. Disclosed to Dr. Dominquez that- "while UIW is a good school, it is only recognized in San Antonio; that he should keep in mind that Regis University is rated higher than UIW in education and that I graduated from Regis University, Catholic [based and private university]." Dr. Dominquez was asked that if he was not able to assist her to provide her a point of contact at the school that could assist her.

53. On or about August 29, 2014, Dr. Dominguez replied via e-mail to Plaintiff, and in summary informed Plaintiff that her "application file was considered in detail by the program's admission committee. In the review process, the admissions committee examines each application as a whole and considers multiple factors such as previous academic performance, current and past professional activities, statements of purpose, recommendation letters as well as, GRE scores where applicable."

54. Dr. Dominquez further explained that the primary reason Plaintiff's "application was unsuccessful is that when considered as a whole, it was not as strong as some of the others we received. Each application is considered in relation to other applications and only the very top applicants are admitted. We are thankful that we are able to attract quality applicants such as yourself. We hope you will continue your search for a graduate school and we wish you the very best in your academic pursuits."

55. On or about Aug 29, 2014, Plaintiff replied to Dr. Dominguez's August 14, 2014 and presented the following:

a. That Dr. Dominquez did not ask Plaintiff for a resume which listed her professional activities nor did he ask her for letters of recommendation.

b. That Dr. Dominquez only requested academic transcripts and a Statement of Purpose.

c. That Plaintiff believed she was treated unfairly; given very little information in order to prepare herself and that basically Dr. Dominquez set her up for failure;

d. That Plaintiff requested a copy of the policy letter outlining the requirements for the MHA program; and that she never received the policies related to the [MHA] program.

e. That when Plaintiff applied for her previous graduate degree, at West Chester University of Pennsylvania, it requested letters of professional activities geared to her success in their Human Resources Administration program. West Chester University of Pennsylvania had the program requirements written down and worked with Plaintiff throughout the [application] process.

f. That Dr. Dominquez at no time requested such letters; and that "Both fields of study are in the Administration of programs. It is obvious that I can and have been successful in this venture."

g. "Mr. Dominguez you did very poorly in asking me questions about my extensive background in Human Resource Management and my experiences. [My] whole interview was on the internship…I am proud that as a single mother working three jobs, I was able to go to school and obtained two degrees from universities that have higher rankings than UIW."

h. "You didn't request that I take a pre-requisite course or work with me if you felt I was deficient in anyway. You just took a look at me and dismissed me."

i. "I will continue to pursue this as I believe you discriminated against me and it is a disgrace the way a Christian school has treated me…"

56. Defendant, Dr. Dominquez, and the Committee reviewing all applications for the opened slots for Defendant's MHA program had no method of scoring; did not have any criteria for scoring each and every requirement needed to be selected for Defendant's MHA program.

57. Defendant's selection process was discriminatory and Plaintiff was just as qualified, if not more, than the individual(s) selected.

58. Plaintiff was entitled to a ten (10) point preferential consideration in any scoring Defendant's Selection Committee used in determining the selection for its MHA program.

59. Serena Amos, Complaint Resolution Specialist at Federal Student Aid/Program Compliance stated Mr. John Garcia, Defendant's Graduate Admissions Counselor who was able to provide the specific reasons for Plaintiff's non-acceptance into the Defendant's MHA Program at the institution. Mr. Garcia reaffirmed Plaintiff's non-acceptance was due to "the applicant doesn't work in the healthcare industry".

60. Defendant has provided two contradictory reasons why Plaintiff was not selected; and Plaintiff was never informed that part of the criteria/requirements for Defendant's MMA program was "working in the healthcare industry."

**E. <u>Discrimination Based on Religion:</u>**

61. While awaiting for her interview, Plaintiff noticed on the table a magazine published by the Defendant. There was an article regarding a potential agreement between Saudi Arabia/Arab countries, and the Defendant; and how a partnership had been created for Saudi Arabia/Arab students to attend Defendant's campus. The article noted a stipulation the Saudi Arabia/Arab government made with Defendant, since Defendant was a Catholic/Christian school. The stipulation was that the Defendant could not teach nor require their students to take Christian classes. According to the article Saudi Arabia/Arab students had their own area for their worship and prayer of their Islamic faith as well as their own School Club at the Defendant's campus.

62. Plaintiff was not given similar accommodations as an American citizen, a Catholic; and a thirty-three (33) year Veteran who has served in three Military Campaigns- Desert Storm and Desert Shield, Operation Enduring Freedom, and Hurricane Mitch Relief. Plaintiff held two degrees, Bachelors of Science in Business and Masters of Science in Human Resource Management and post graduate course work at Villanova University. Defendant and Dr. Dominquez engaged in gender and age discrimination.

**F. <u>Plaintiff's Exhaustion of Administrative Remedies:</u>**

63. In an e-mail dated October 21, 2014, to HEB, corporate sponsor of Defendant's MHA program, Plaintiff disclosed Defendant's and Dr. Dominquez' discriminatory conduct. Plaintiff informed the Archdiocese of San Antonio, via letter, of Defendant's and Dr. Dominquez' discrimination.

64. Plaintiff received Defendant's official's Letter of Denial of non-selection dated July 17, 2014 and postmarked July 30, 2014.

65. On or about August 22, 2014, Plaintiff requested all of her paperwork/transcripts files etc. be returned to her; Mr. Garcia denied Plaintiff's request.

66. On or about August 28, 2014, Plaintiff filed a discrimination complaint with the Principles of Excellence Complaint, a Veterans Administration agency and denied her claim on the basis it had no jurisdiction if the case was directly related to benefit funding rather than school policy; and did address discrimination cases. The VA Principles of Excellence forwarded Plaintiff complaint to the U.S. Department of Education Office of Civil Rights (OCR).

67. On October 9, 2014, OCR notified Plaintiff her complaint, Claim No. O6142376, of age discrimination was being assigned to mediation in accordance with the Federal Mediation and Conciliation Service (FMCS).

69. The mediation did not take place because Plaintiff was told Defendant would be represented by legal counsel at the mediation. Plaintiff invoked her right to seek legal counsel and did not proceed with the mediation.

70. After Plaintiff withdrew from the mediation to seek legal counsel, the OCR did not pursue their investigation of Plaintiff's age discrimination claims against Defendant.

71. On January 26, 2015, the OCR informed Plaintiff her complaint stating her allegations "based on [additional] information you provided, the OCR has determined you have not provided sufficient factual detail for OCR to infer that age, national origin and/or sex discrimination has occurred or is occurring".

72. The OCR's letter dated January 26, 2015 informs Plaintiff, "You may file a private suit in Federal court whether or not OCR finds a violation"; but fails to inform Plaintiff of any deadlines of when she needs to file her claims in federal court.

73. The OCR intentionally and knowingly denied Plaintiff a proper notice of her rights, including timelines and deadlines to file her claims in federal court.

74. On or about March 25, 2015, Plaintiff filed a discrimination claim with the Equal Employment Opportunity Commission (EEOC).

75. The EEOC Dismissal and Notice of Rights dated May 8, 2015 was received by Plaintiff on May 11, 2015.

76. Plaintiff sought legal counsel on her claims on or about April 10, 2015.

77. Plaintiff reasonably believes the OCR intentionally withheld information regarding her timelines to file her claims in federal court; and Plaintiff has with due diligence has pursued her claims.

78. Plaintiff timely files her claims in court and has exhausted her administrative remedies.

## IV. CAUSES OF ACTION

### A. Title VII Employment Discrimination:

79. The Defendant's conduct as stated above constitutes a violation of the Equal Employment Opportunity Acts prohibitions of discrimination based upon Race (Colombian); National Origin (Colombian-American); sex (female); age; religion; and disability. 42 U.S.C. 2000e, et seq.

80. This violation caused Plaintiff to suffer economically, emotionally, and other damages.

### B. Age Discrimination Act of 1975 Discrimination:

81. The Defendant's conduct as stated above constitutes a violation of the Age Discrimination Act of 1975, 42 U.S.C. § 6101-6107 prohibiting discrimination on the basis of age.

82. This violation caused Plaintiff to suffer economically, emotionally, and other damages.

**C. Title VI of the Civil Rights Act of 1964, Discrimination:**

83. The Defendant's conduct constitutes a violation of Title VI of the Civil Act of 1964, 42 U.S.C. § 2000d et seq., prohibiting discrimination on the basis of color, race (Colombian), and national origin (Colombian-American);

84. This violation caused Plaintiff to suffer economically, emotionally and other damages.

## V. DAMAGES

85. Defendant's acts and omissions have caused Plaintiff to suffer damages including past and future lost earnings; past and future injury to reputation, and past and future mental anguish.

86. Plaintiff seeks recovery of these damages from Defendant.

## VI. ATTORNEY FEES

87. Defendant's acts and omissions have caused Plaintiff to incur attorney's fees and court costs. Plaintiff is entitled to an award of attorney's fees and costs under Title VII, 42 U.S. C. § 2000e-5(K); Title VI Civil Rights Act of 1964 (42 U.S.C. 2000e–16), including the application of sections 706 (f) through 706 (k) (42 U.S.C. 2000e–5 (f) through (k)) (and the application of section 706 (e)(3) (42 U.S.C. 2000e–5 (e)(3); and those granted under the Age Discrimination Act of 1975, 42 U.S.C. § 6101-6107. Plaintiff seeks recovery from Defendant of all attorney fees and court costs through judgment in this court with additional contingent amounts in the event of post- judgment and appellate proceedings. All conditions precedent to the recovery of attorney fees have

been satisfied.

88. Plaintiff seeks recovery of these damages from Defendant.

## VII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendant be cited to appear and answer herein to Plaintiff's Original Complaint, and that upon final trial, this court enter a judgment awarding the Plaintiff all of the aforementioned damages, attorney fees, costs of court, and prejudgment and post-judgment interest. Plaintiff also asks for such other and further relief, whether legal or equitable, to which Plaintiff may be justly entitled.

Plaintiff requests a jury trial.

Respectfully Submitted,

LAW OFFICES OF ARTHUR G. VEGA
419 S. Main, Suite 301
San Antonio, Texas 78204
(210) 224-8888
(210) 225-7751- Fax
E-mail: artavega@yahoo.com

ARTHUR G. VEGA
State Bar No. 20533600

ATTORNEY FOR PLAINTIFF